IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, <br><br> Plaintiff, <br><br><br> vs. <br><br><br> CML METALS CORPORATION, <br> Defendant. | ORDER <br> AND <br> MEMORANDUM DECISION <br><br><br> Case No. 2:12-cv-00934-TC |

This is an insurance coverage case arising out of two insurance policies issued by National Union Fire Insurance Company (National Union) and Lexington Insurance Company (Lexington). Both policies were issued to CML Metals Corporation (CML) for construction of an iron ore concentrate plant in Iron County, Utah. The Lexington policy covered the period from April 6, 2011, to April 6, 2012. The National Union policy covered from April 5, 2012, to April 5, 2013. After experiencing extensive damage during the hot testing phase at the plant, CML made claims under both policies. Both National Union and Lexington denied coverage.

On October 3, 2012, National Union filed a complaint for declaratory relief against CML. CML filed a counterclaim against National Union and Lexington, alleging claims for declaratory relief, breach of contract, and breach of the implied covenant of good faith and fair dealing. CML and National Union have now stipulated to the dismissal of all claims between them, which leaves CML and Lexington as the two remaining parties in this case.

Both CML and Lexington filed multiple motions for partial summary judgment based on various provisions of the Lexington policy. Lexington maintains that the policy and exclusions foreclose coverage, while CML contends that the policy broadly covers the damages it incurred.

After careful consideration of the evidence and the relevant legal authority, the court concludes that CML has produced sufficient evidence of losses occurring within the Lexington policy period.  But for physical damage that occurred after the policy expired on April 6, 2012, CML has not met its burden to prove coverage for its damages.  Accordingly, the court grants in part and denies in part Lexington's Motion for Partial Summary Judgment No. 1 Re CML's Physical-Damage Claims (ECF No. 231).  In addition, the court concludes that the policy's general exclusions do not apply to hot testing and therefore grants CML's Motion for Partial Summary Judgment and Supporting Memorandum Number One – Hot Testing Extension (ECF No. 208).  Because there are disputed issues of fact for the amount of CML's pre-April 6, 2012 damages, the court denies Lexington's Motion for Partial Summary Judgment No. 4 Re Application of the Hot Testing Deductible (ECF No. 234). Finally, the court's conclusion that CML has not established coverage for its post-April 6, 2012 damages dictates the outcome of the remaining motions: the court denies CML's motions (ECF Nos. 209 and 228) and grants Lexington's motions (ECF Nos. 232, 233, 235, 236, and 237).

2

# BACKGROUND[1]

CML is a Utah mining company in the business of producing, marketing, shipping, and selling iron ore. CML's mining operations are based in Iron County, Utah, at a mine known as Iron Mountain. In early 2011, CML began construction of a concentrate plant at Iron Mountain that would enable CML to process raw iron ore into a concentrate product. CML hired Samuels Engineering to design and oversee construction of the plant. CML also obtained a $45,000,000 loan from Credit Suisse to finance the project. The Credit Suisse loan agreement mandated that CML obtain insurance coverage, including coverage during the construction of the plant and after completion. So CML's insurance broker obtained a policy from Lexington with a policy period from April 6, 2011, to April 6, 2012, and a policy from National Union with a policy period from April 5, 2012, to April 5, 2013.

After the plant was built but before it became operational, CML began what is known as the "hot testing" phase of construction. Hot testing is defined in the Lexington policy as "[a]ny startup commissioning or other forms of testing making use of any feedstock or similar media including operational or performance tests." (Lexington Policy at LUW0025, ECF No. 223-1.) Penn Leavitt, the manager of the Iron Mountain mine, described the process as follows:

---

[1] Based on a review of the parties' briefing and the materials they have submitted, the court concludes that there are very few genuinely undisputed material facts. The parties dispute even the basic background facts. In the Background section, the court has taken many of the facts from the parties' initial briefing and from other sources in the record. These facts are not material to the issues on summary judgment and are included to provide the reader with background and context. In the Analysis section, the court lays out the material facts for each issue, and all reasonable inferences from those facts, in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).

CML hired Samuel Engineering, a specialty engineering firm, to design and build the Plant, which occurred from approximately February 2011 through February 2012. The final plant design includes a series of proven systems, including a SAG mill, a ball mill, cyclones, motors, separators, pumps, belts, gears, electrical systems, and tanks, all working in unison to crush, process, and refine the iron ore to a concentrated state for ultimate export to CML's customers. Material from CML's mine, including rocks up to about the size of a softball, enters the Plant. The Plant is designed so that the ore exiting the Plant is finer than a grain of sand with, as noted, an iron content of at least 67%.

. . .

In order to test the Plant, Samuel Engineering ran water – as a precursor to ore from the mine – through the Plant beginning mid-February 2012. Thereafter, raw iron ore was introduced into the Plant. Specifically, on February 24, 2012, iron ore was fed into the Plant.

(Leavitt Report at 2, ECF No. 269-8.)

When iron ore was introduced during hot testing, CML experienced significant problems:

The Hot Testing phase of commissioning at CML's Plant proved to be catastrophic. Soon after Hot Testing began, the filter presses' hydraulic degassing system exploded. High-pressure oil blew into the Plant and, among other things, damaged the ceiling some 50 feet overhead. As a result of the explosion, the Plant had to be shut down. Repairs were undertaken, but when Hot Testing resumed, so did the problems at the Plant. For example, seals blew apart; motors failed; bearings seized; couplings ruptured; and electrical fires occurred.

(Id.)

In July 2012, CML filed claims under both the National Union and Lexington policies for the damage that occurred during and after hot testing. After receiving CML's loss notices and investigating the claim, National Union attempted to rescind CML's coverage based on alleged misrepresentations by CML. National Union then filed its complaint on October 3, 2012, seeking declaratory relief on the issue of coverage. On December 5, 2012, CML filed a counterclaim against National Union and Lexington.

4

## ANALYSIS

Both parties argue that the language of the Lexington policy supports summary judgment in their favor. A few provisions of the policy are particularly critical to the court's analysis, but the parties initially disagree about the applicable standards for interpreting the policy. First, the parties dispute who holds the burden of proof: CML asserts that Lexington must prove that an exclusion applies, while Lexington contends that CML must establish a covered loss. For substantive construction, CML argues that the policy as a whole should be construed in favor of coverage, while Lexington maintains that there is no presumption of coverage where the policy is facially clear. Both parties are partially correct depending on the specific provision at issue.

Under Utah law,[2] "once the insured has established the right of coverage under the insuring clause and liability coverage is triggered, the insurer has the burden to demonstrate that exclusions exist under which it can deny coverage." Am. Nat'l Prop. & Cas. Co. v. Sorensen, 2013 UT App 295, ¶ 13, --- P.3d ---.  In other words, the insured has the initial burden to prove a loss covered by the policy, but where the insurer invokes an exclusion as the basis for denying coverage, it must prove that the exclusion applies.

Although insurance policies "are to be construed liberally in favor of the insured and their beneficiaries so as to promote and not defeat the purposes of insurance," Farmers Ins. Exch. v.

---

[2] CML relies on a Second Circuit case, Haber v. St. Paul Guardian Insurance Co., 137 F.3d 691 (2d Cir. 1998), to argue that Lexington must show that its proposed construction is the only reasonable reading of the policy. Although the parties differ in their proposed application of the law, neither party has argued that there is a conflict-of-law issue in this case. Rather, the parties agree that Utah law governs. And Utah law sufficiently provides the standards for interpreting the policy. Because the Second Circuit's standards in Haber differ from controlling Utah law, the court declines to apply Haber here.

Versaw, 2004 UT 73, ¶ 24, 99 P.3d 796 (quotations omitted), Utah courts reject the "broad assertion" that an insured is always entitled to a strong presumption in favor of coverage.  First Am. Title Ins. Co. v. J.B. Ranch, Inc., 966 P.2d 834, 837 (Utah 1998).  In each case, the court must determine whether the relevant provisions are ambiguous.  "If a policy is ambiguous, it is construed liberally in favor of the insured . . . ."  S.W. Energy Corp. v. Cont'l Ins. Co., 1999 UT 23, ¶ 12, 974 P.2d 1239.  If a policy is not ambiguous, "no presumption in favor of coverage arises; rather, the policy language is construed pursuant to its ordinary meaning."  Id. ¶ 13.

Here, CML seeks $36,680,847 for alleged physical damage at the Iron Mountain plant. This amount includes $1,128,093 for physical damage before April 6, 2012, and $35,552,754 for damage after the policy expired.  In Lexington's Motion for Partial Summary Judgment No. 1 Re CML's Physical-Damage Claims (ECF No. 231), Lexington argues that CML cannot meet its initial burden to prove that any of its alleged damages qualify as covered losses.  Lexington relies on the policy's insuring agreement, which states that the policy "insures against all risks of direct physical loss of or damage to insured property while at the location of the **INSURED PROJECT\*** while in offsite temporary storage or while in inland transit, all within the policy territory and occurring during the term of this policy."  (Lexington Policy at LUW0017.)

This provision is not ambiguous.  Indeed, the parties do not argue that it is.  According to its plain language, the insuring agreement imposes certain prerequisites for coverage, including (1) "direct physical loss of or damage to insured property" that (2) "occurr[ed] during the term of this policy."[3]  For the reasons explained below, the court concludes that the majority of CML's

---

[3] All-risk policies consistently include the same requirements.  See, e.g., Banco Nacional De Nicaragua v. Argonaut Ins. Co., 681 F.2d 1337, 1340 (11th Cir. 1982) ("The plaintiff in a suit

designated pre-April 6, 2012 damages are covered by the policy because they reflect losses caused by direct physical damage that occurred during the policy period. But for damage after April 6, 2012, CML has not satisfied the terms of the insuring agreement—namely, the requirement to prove that its damages occurred within the policy period.

## I.     Physical Damage During the Policy Period

Both parties have produced evidence of multiple instances of physical damage that occurred at the Iron Mountain plant before April 6, 2012. On June 25, 2012, CML sent a report to Lexington "written primarily to document for insurance purposes those heads of claim that may support a recovery from insurance purchased pursuant to the CML loan covenants." (Property Loss Report at LUW0054, ECF No. 223-8.) CML described mechanical breakdowns that occurred both before and after April 6, 2012. Moreover, Lexington's expert, Dr. Richard Klopp, acknowledged the physical damage before April 6, 2012, as listed in CML's report.

The first relevant event occurred on February 27, 2012, when the hydraulic degassing system failed. According to CML,

> [t]he malfunction of the pressure relief regulator caused an over-pressure situation which resulted in failure of the hydraulic hose coupling creating high pressure sprays of hydraulic oil. This spray not only caused physical damage to the building roof (necessitating cleaning), but also required the plant be shut down multiple times over almost a week-long period while the filters caught up in throughput and while CML awaited Matec's technician arrival to fix the problem. This issue was resolved by March 2nd when the Matec representative was onsite.

---

under an all-risks insurance policy must show a relevant loss in order to invoke the policy, and proof that the loss occurred within the policy period is part and parcel of that showing of a loss."); Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co., 245 F. Supp. 2d 563, 582 (D.N.J. 2001) ("The insured bears the burden of demonstrating physical damage or loss manifesting within the pertinent policy period in order to demonstrate a relevant loss.").

(Id. at LUW0055.)  Dr. Klopp confirmed that "[t]he hydraulic hose failed creating high-pressure and sprayed oil during operating causing some physical damage to [the] building. The issue with the lines was fixed by March 2, 2012."[4]  (Klopp Prelim. Report (Aug. 9, 2012) at 3, ECF No. 270-1.)

On March 4, 2012, a roller bearing in the SAG mill gearbox failed, overheated, and welded itself to the drive shaft.  The mill was shut down until March 20, 2012, when the bearing was replaced and the SAG mill placed back in service.

While CML was replacing the bearing in the SAG mill gearbox, it also experienced other problems with the SAG mill lube system.  Dr. Klopp identified nine pre-April 6, 2012 events—including pump leaks and shutdowns of the plant due to insufficient oil and oil pressure—that relate to CML's claim for $46,020 in physical damage to the SAG mill lube system.  Although Dr. Klopp opines that there is no evidence that these events involved actual damage, CML has produced evidence to the contrary.  Three witnesses (Samuel Paioletti, Dale Gilbert, and Penn Leavitt) provided declarations in which they each testified that pumps in the SAG mill lube system suffered ruptured seals, leaks, and overheating, which required the replacement of multiple pumps between March and June 2012.  The pump damage is also reflected in a schedule summarizing the events that occurred, the replacement of the pumps, and the related costs.  "View[ing] the evidence and mak[ing] all reasonable inferences in the light most favorable to the nonmoving party," N. Nat. Gas Co. v. Nash Oil & Gas, Inc., 526 F.3d 626,

---

[4] Additional issues related to the hydraulic degassing system will be analyzed below in the court's discussion of Lexington's Motion for Partial Summary Judgment No. 4 Re Application of the Hot Testing Deductible (ECF No. 234).

8

629 (10th Cir. 2008), the court concludes that CML has presented sufficient evidence to create a

factual issue about whether and to what extent the SAG mill suffered physical damage.

More troubles began April 1, 2012, when the high pressure hydraulic pump failed to

reach the required pressure to allow the filter to operate correctly.  After investigation, CML

determined that the pump coupling was the wrong size.  Replacement pumps were installed and

the problem was resolved by May 5, 2012.  "Concurrently with the hydraulic pump issues, the

Pemo feed pumps began to show signs of mechanical breakdown starting April 2, 2012.  The

gland seals began to fail and leak slurry at this point, causing breakdown of the individual gland

seal pumps and inability to run the feed pumps." (Property Loss Report at LUW0055.)  The

manufacturer never explained why the seals failed, but the damage caused at least a couple of

days of downtime at the plant.  Lexington appears to concede that both the hydraulic pump and

Pemo pump issues represent physical damage that occurred before the policy expired.

The final instance of damage took place on April 27, 2012, when the Liquid Resistive

Starter (LRS) for the SAG mill failed.  CML explained in its report to Lexington that "[f]rom the

first day that the SAG mill was started, there was abnormal sparking inside the LRS housing."

(Id. at LUW0058.)  But on April 27, 2012, "the LRS failed completely and forced a failed start of

the mill due to an over-current fault."  (Id.)  CML's Chief Operation Officer, Samuel Paioletti,

testified that the LRS problems began around March 28, 2012, and continued until approximately

the end of April 2012, when the LRS completely failed.  Viewing this evidence in the light most

favorable to CML, the court concludes that the evidence sufficiently supports CML's position

that the LRS damage began during the policy period and continued until the ultimate failure in

late April 2012.

CML has met its burden of pointing to facts showing that each of the above losses reflect direct physical damage that occurred before April 6, 2012.  Accordingly, these losses fall within the scope of the insuring agreement and the court denies Lexington's Motion for Partial Summary Judgment No. 1 Re CML's Physical-Damage Claims (ECF No. 231) for CML's pre-April 6, 2012 losses.

A.      **Hot Testing Extension**

Lexington maintains that, even if CML's pre-April 6, 2012 damages qualify as covered losses under the insuring agreement, the policy's exclusions preclude coverage. Lexington focuses on two general policy exclusions that exclude the "cost of making good faulty or defective workmanship or material" and the "cost of making good fault, defect, error, deficiency or omission in design, plan or specification."  (Lexington Policy at LUW0019.)   Relying on Dr. Klopp's opinion that CML's pre-April 6, 2012 damages were caused by defective design or workmanship, Lexington argues that CML's losses are not covered by the policy.

CML responds to this argument in its first motion for partial summary judgment by requesting an order that "the generic Policy exclusions do not apply to the additional coverage CML purchased in the form of the Hot Testing Extension."  (Mot. for Partial Summ. J. Number One – Hot Testing Extension at 1, ECF No. 208.)  Because CML paid an additional $25,600 premium to add hot testing coverage to the policy, it argues that its payment should not be rendered meaningless by applying the policy's exclusions to damages that occurred during hot testing.  According to CML, if the hot testing extension had not been purchased, the policy still would have covered hot testing but subject to the general exclusions.  By purchasing additional coverage, CML obtained extended coverage that was not limited by exclusions.

10

The Lexington policy includes an "extension of coverage" for hot testing, which states that the "policy is extended to cover direct physical loss or damage to the property insured which is caused by or results from **HOT TESTING\***." (Lexington Policy at LUW0018.)  Although none of the general policy exclusions explicitly exclude damages caused by hot testing, the purpose of hot testing is "to test the [p]lant," (Leavitt Report at 2, ECF No. 269-8), i.e., to identify and fix any defects or problems before beginning full operation.  Exclusions for faulty or defective design and workmanship would operate to eliminate coverage for much of the damage that may occur and be resolved during hot testing.

With this potential conflict between policy provisions, the court must read the policy "as a whole, in an attempt to harmonize and give effect to all of the contract provisions."  Aspen Specialty Ins. Co. v. Utah Local Gov't Trust, 954 F. Supp. 2d 1311, 1315 (D. Utah 2013) (quotations omitted).  In addition, policy exclusions "should be strictly construed against the insurer" and should be given effect "only when they use language which clearly and unmistakably communicates to the insured the specific circumstances under which the expected coverage will not be provided."  Fire Ins. Exch. v. Oltmanns, 2012 UT App 230, ¶ 6, 285 P.3d 802 (quotations omitted).

In Certain Underwriters at Lloyd's Subscribing to Policy No. WDO-10000 v. KKM Inc., 215 S.W.3d 486 (Tex. App. 2006), the court applied similar interpretation rules, including the rule that the policy be read as a whole "in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless."  Id. at 491.  The insured argued that an "Additional Coverage" provision trumped the policy exclusions.  In particular, the policy contained an exclusion for damage caused by "decay," but the "Additional Coverage"

11

provision specifically provided coverage for collapse caused by "[d]ecay that is hidden from view." KKM, 215 S.W.3d at 494.  The court concluded that "[t]he 'Additional Coverage' provision supplement[ed] the coverage otherwise provided, extending it beyond the carved out exclusions."  Id.

The court in York Insurance Co. v. Williams Seafood of Albany, Inc., 544 S.E.2d 156 (Ga. 2001), similarly held that an extension prevailed over an exclusion.  The policy in York contained an "Additional Coverage" section that extended coverage for sinkhole collapse.  The extension included its own exclusions but did not refer to the general exclusions in other sections of the policy.  The court concluded that sinkhole collapse was covered by the all-risk clause of the policy even in the absence of the extension.  If the exclusions applied to damages caused by sinkhole collapse, the additional coverage provided by the extension would be rendered meaningless.  Giving effect to each policy provision and strictly construing the exclusions against the insurer, the court held that the extended coverage was not limited by the policy's general exclusions.

Other courts interpreting similar policies have also held that the extension controlled. See, e.g., Henry's Marine Serv., Inc. v. Fireman's Fund Ins. Co., 193 F. App'x 267, 277 (5th Cir. 2006) (extension "would be rendered meaningless by Fireman's Fund's pre-summary judgment interpretation of it and the base policy exclusion"); Malbco Holdings, LLC v. AMCO Ins. Co., 629 F. Supp. 2d 1185, 1192 (D. Or. 2009) (dismissing affirmative defenses that were "premised on policy exclusions that conflict with, and are trumped by, the 'Additional Coverages'"); Cincinnati Ins. Co. v. Recreation Ctrs. of Sun City, Inc., No. CV-07-0329-PHX-PGR, 2008 WL 898725, at *5 (D. Ariz. Mar. 31, 2008) ("[T]he coverage extension for a collapse caused in part

by hidden decay trumps the general exclusions."); <u>JD & K Assocs., LLC v. Selective Ins. Grp.,</u>

<u>Inc.</u>, 988 N.Y.S.2d 749, 751 (N.Y. App. Div. 2014) ("Any ambiguity arising from the conflict

between the exclusion and the extension of coverage was properly resolved in favor of plaintiff

and against defendants.").  Lexington has not cited a case that holds to the contrary.

 Here, the hot testing extension states that when an additional premium is paid, the policy

is extended to direct physical loss or damage caused by or resulting from hot testing.  This

extension is written differently than other extensions in the policy.  While other extensions

explicitly state that the additional coverage applies in the event that physical loss or damage

would otherwise be "insured hereunder," the hot testing extension does not include any similar

limiting language.  If Lexington wished to make hot testing coverage subject to exclusions, it was

required to "clearly and unmistakably communicate[] to [CML] the specific circumstances"

under which hot testing coverage would not be available.  <u>Oltmanns</u>, 2012 UT App 230, ¶ 6.

Because the hot testing extension does not make clear that the general policy exclusions apply,

the court construes the extension liberally in favor of coverage.

 Moreover, the Lexington policy "insures against all risks of direct physical loss of or

damage to insured property . . . occurring during the term of this policy."  (Lexington Policy at

LUW0017.)  Nothing in this language or in any other provision of the policy limits coverage for

hot testing.  Rather, hot testing falls within the broad scope of "<u>all</u> risks" and would have been

covered even in the absence of an explicit extension.  If the hot testing extension is subject to all

general exclusions, it provides no additional coverage beyond what was already provided by the

policy.  Such a reading would render the extension, and CML's corresponding premium,

superfluous.  To avoid "relegat[ing] [CML] to a status which would give [CML] no more

13

coverage than [it] had before endorsement was made and payment was given," Unigard Ins. Co. v. Studer, 536 F.2d 1337, 1339 (10th Cir. 1976), the court declines to apply the general exclusions to hot testing.

Although Lexington contends that CML's position rests on the "false premise" that if CML had not purchased the hot testing extension, it would still have had hot testing coverage, Lexington bases this argument on evidence related to a different policy that included an extension for earthquake coverage. This extrinsic evidence does not support the conclusion that CML was required to pay an additional premium before obtaining hot testing coverage. The evidence does not address hot testing in any way; it only addresses earthquake coverage. And the evidence relates to a different policy. There is nothing in this policy or in the other evidence in this case that supports Lexington's position.

Because the hot testing extension must be given some meaning beyond the coverage already provided by the policy, the court holds that hot testing damages are not subject to the general policy exclusions. CML's Motion for Partial Summary Judgment and Supporting Memorandum Number 1 – Hot Testing Extension (ECF No. 208) is granted.

### B.     Hot Testing Deductible

Finally, even if pre-April 6, 2012 damages occurred during the policy period and are not limited by exclusions, Lexington argues that CML has not identified losses that exceed the $250,000 hot testing deductible. In its damages summary, CML lists $986,424 in pre-April 6, 2012 losses originally allocated as costs to repair the hydraulic degassing system. This amount includes the balance of an invoice from Samuel Engineering ($612,589); the balance of an invoice from Tons Per Hour ($73,454); and the costs to rent air compressors when adding "core

14

blow" and "cake blow" systems to the plant ($255,013).  Lexington argues that none of these items reflect work that was necessary to repair covered physical damage and, after deleting these costs, CML's damages are less than the applicable deductible.  Although CML now concedes that these costs may not be conclusively linked to work on the degassing system, CML has met its burden to produce evidence showing that the Samuel Engineering invoice reflects repair of damages that occurred before April 6, 2012.  But CML cannot prove that the work performed by Tons Per Hour was done to repair physical damage during the policy period.

### i.  Samuel Engineering Invoice

The first invoice reflects work performed by Samuel Engineering during March 2012. Lexington argues that the invoice does not show repairs of the degassing system, citing testimony from Josh Maida, a Samuel Engineering representative.  In his deposition, Mr. Maida was unsure about the terms used by the vendors for certain pieces of equipment, including the degassing system.  And he did state that the vendors handled most of the repairs.  But he testified that even after the hydraulic hose coupling was repaired on March 2, 2012, "there were other issues with hydraulic oil, the oil system in general." (Maida Dep. at 324, ECF No. 269-3.)  Although Mr. Maida deferred to the vendor to identify and ultimately fix the degassing system failure, he stated that Samuel Engineering employees worked with the vendor during this process. When asked to estimate how many hours Samuel Engineering employees spent repairing the degassing system, Mr. Maida testified that "the plant shut down at this point because of the degassing system; so just because we weren't necessarily sitting there with a wrench fixing the thing, people were elsewhere trying to balance the plant out, get it up and running again, and so forth."  (Id. at 325.)

15

CML's Chief Financial Officer, Shan Edwards, also testified that "the activities that Samuel Engineering performed in March of 2012 was [sic] associated with fixing the damages at the plant," including fixing the hydraulic degassing system.  (Edwards Dep. at 265-66, ECF No. 281-5.)  Mr. Edwards further stated, "I can tell you that during the month of March, Samuel Engineering worked on various damages at the plant."  (Id. at 266.)

Even if CML misstated that all of the work listed in the Samuel Engineering invoice was related to the degassing system, CML has produced evidence that creates factual disputes about whether the March 2012 invoice reflects repairs of physical damage occurring before April 6, 2012.  And with a total payment of $612,589 to Samuel Engineering, the amount of this invoice alone exceeds the $250,000 deductible.  Accordingly, the court denies Lexington's Motion for Partial Summary Judgment No. 4 Re Application of the Hot Testing Deductible (ECF No. 234).

### ii.    Tons Per Hour

Another part of CML's pre-April 6, 2012 damages claim is the amount it paid Tons Per Hour (TPH), a company that specializes in filter presses and wastewater treatment. The parties have invoked many provisions of the policy to argue that coverage should be either excluded or provided for the work done by TPH.  But the threshold issue is whether this work qualifies as a covered loss under the insuring agreement.

CML company witnesses (including Dale Gilbert, Penn Leavitt, and Samuel Paioletti), provided declarations in which they each state that TPH investigated and helped solve the abnormal cycling at the plant.  According to Mr. Gilbert, Mr. Leavitt, and Mr. Paioletti, TPH evaluated and repaired a crack in the frame of one of the filter presses and then recommended that CML install "core blow" and "cake blow" systems.  But none of these witnesses describe

16

when the crack occurred or how the installation of new systems related to physical damage before April 6, 2012.

Michael Parker, TPH's owner and CEO, testified that the July 2012 invoice shows TPH's work in diagnosing, addressing, and mitigating damages resulting from abnormal cycling, particularly as the cycling affected the dewatering circuit.  TPH "evaluated ways that the capacity of the dewatering system at the CML Plant could be expanded in order to try and stabilize the CML Plant operations" and recommended that CML install core blow and cake blow systems "in order to more efficiently handle the slurry fed to the presses."  (Parker Decl. ¶¶ 5-7, ECF No. 270-5.)  While this describes TPH's work, Mr. Parker has not identified any work by TPH before April 6, 2012, and he has not explained how the later work related to pre-April 6, 2012 damage.

Finally, Shan Edwards testified as follows about the TPH invoice:

Q.  What did Tons Per Hour do for CML . . . .?

[Objections omitted]

THE WITNESS:  As a result of the damages, we engaged Tons Per hour to make some adjustments, it looks like, to the filter presses, so we could continue operating and mitigate damages.

Q.  (BY MS. MARKOV) Do you now what adjustments those were?

A.  It looks like the coreblow and cakeblow adjustments.

Q.  What did -- what does -- is the coreblow and cakeblow a repair to any physical damage that occurred on or before April 6, 2012?

[Objection omitted]

A.  Well, again, we experienced these damages when we began feeding product into the plant.  To fix the damages and to continue to operate, in this specific instance, we hired Tons per Hour to come in and do some work so we could continue operating.

(Edwards Dep. at 267-68, ECF No. 281-5.)  Mr. Edwards did not clarify what he meant when he referred to "damages," and he did not identify when the "specific instance" of damage occurred that TPH was hired to address.

TPH did not perform its work until June and July 2012.  TPH then issued a July 2012 invoice, and CML paid TPH $73,454.  CML also paid $255,013 to rent air compressors that were necessary to install the core blow and cake blow systems that TPH suggested.  Although the evidence supports the idea that TPH performed work to repair and improve the plant after it had experienced multiple breakdowns, there is nothing that links TPH's work to specific damage occurring before April 6, 2012.  CML asserts that there is a nexus between the degassing system failure in March 2012 and TPH's work months later in June and July 2012.  But CML has not identified or described that nexus in any way.  And the court cannot identify such a nexus with the evidence presented to it.

Even when viewed in CML's favor, the evidence merely shows that the degassing system failed on February 27, 2012.  CML confirmed in its property loss report that the hose at the root of the failure was repaired by March 2, 2012.  Yet CML seeks $328,467 for installation of core blow and cake blow systems and for air compressors for the new systems, without explaining how these costs relate to any aspect of physical damage occurring before April 6, 2012.

Although CML witnesses testified generally that TPH's work relates to abnormal cycling, as explained below, such statements do not support the conclusion that TPH's work repaired damages occurring during the policy period.  The court grants summary judgment in Lexington's favor for these damages.  CML may not include its payment to TPH or its costs to rent air compressors as part of its pre-April 6, 2012 damages claim.

18

II.      **Physical Damage After the Policy Period**

Lexington maintains that summary judgment is appropriate for all other physical damage

after April 6, 2012, because CML cannot satisfy its burden to prove that such losses occurred

within the policy period.  Because CML has the burden to prove that its losses are covered by the

policy, Lexington can satisfy its initial burden on summary judgment by showing "an absence of

evidence to support [CML's] case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The

burden then shifts to CML to "designate specific facts showing that there is a genuine issue for

trial." Id. at 324 (quotations omitted).

Lexington argues that no CML witness has analyzed the specific aspects of damage at the

plant, including the post-April 6, 2012 damage, or the causes of such damage.  Lexington's

expert, Dr. Klopp, did investigate the damages at the Iron Mountain plant after CML filed its

claim under the Lexington policy.  And after examining CML's alleged damages, Dr. Klopp

provided the following summary of his opinions about the physical damage to the plant:

> Just because there were a number of problems that occurred during the pre-April 6,
> 2012 "hot testing" period, it does not follow that hot testing caused the failures.
> Similarly there is no evidence to support the contention that on-off cycles of plant
> equipment or "out-of balance operation" during the "hot testing" period caused later
> breakdowns. In my analysis, I found no evidence establishing causation between the
> pre-April 6, 2012 physical damage events and any post-June 5, 2012 downtime or
> physical damage event.

(Klopp Report at 1, ECF No. 238-8.)

CML's response is summarized in the declaration of CFO Shan Edwards:

> With respect to the damages for physical events occurring after April 6, 2012 that
> CML is seeking to recover under its policy with Lexington, it is CML's position that
> the entire $35,552,754 was incurred in order to address, repair, and/or mitigate
> physical damage to insured property that CML suffered.  It is CML's position that

19

those costs, although incurred after April 6, 2012, were necessitated by pre-April 6,
2012 damages to the CML plant and equipment.

Edwards Decl. ¶ 3, ECF No. 269-8.)

To support this position, CML asserts two theories.  First, CML argues that the Lexington
policy covers post-April 6, 2012 losses when caused by pre-April 6, 2012 damage.  In the
alternative, CML argues that the policy covers damage that occurred before April 6, 2012, but
was not discovered until after the policy period ended.

### A.      Damages Caused by Pre-April 6, 2012 Events

According to CML, physical damage and abnormal cycling (i.e., frequent starts and stops
of the plant) occurred before April 6, 2012, and caused ongoing damage after the policy expired.
As CML's counsel explained at oral argument, "CML is contending that the hot testing damages
caused the abnormal cycling and that that abnormal cycling in turned caused additional events"
of physical damage.  (Hr'g Tr. 112-13, ECF No. 329.)

As an initial response to this theory, Lexington cites Great Lakes Dredge & Dock Co. v.
City of Chicago, 260 F.3d 789 (7th Cir. 2001), and maintains that CML cannot rely on a causal
event during the policy term to trigger coverage for post-policy damage.  The insured in Great
Lakes replaced pilings that protected a bridge on the Chicago River.  The insured worked
carelessly and/or based its work on poor maps and directions from the City of Chicago, and
drove the pilings into the riverbed directly above tunnels used to carry water and to run electrical
and communications lines.  Cracks grew in the tunnel ceiling over several weeks and eventually
the tunnel roof caved in and water rushed through the tunnel system and flooded basements and
streets throughout downtown Chicago.

The insured had obtained successive primary and excess insurance policies that ended after the initial tunnel damage but before the flood.  When the excess insurer denied coverage for local businesses' third party claims, the court was asked to address the issue of whether the claims triggered coverage where the excess policy had expired before the flooding occurred. Although the tunnel was damaged during the policy period, the court concluded that the excess policy was not triggered because "an occurrence policy is not triggered unless loss *to the claimant* happened while that policy was in force." Id. at 795.  The policy defined "property damage" as an "accident or happening or event that results in a physical injury to tangible property *during the policy period*." Id. (quotations and alterations omitted, emphasis in original).  Because the claimant businesses did not suffer damage until after the policy expired, there was no "occurrence" that triggered coverage during the policy period.

The facts and policy language in this case are materially different than in Great Lakes. First, Great Lakes involved a third party claim against the insured's excess policy.  Even though the tunnel was damaged during the policy period and the tunnel damage was the ultimate cause of the businesses' losses, the local businesses did not suffer damage until after the policy expired. Under the policy language in Great Lakes, the timing of the causal event was irrelevant; the relevant question was whether the claimants' ultimate injuries occurred during the policy period.

The question is different here, as are the circumstances and policy language.  This is not a case where a third party is claiming separate, subsequent losses.  CML seeks to recover for first party damage to the property insured by the Lexington policy, based on a theory that its first party losses resulted from an ongoing sequence of events that began during the policy period and caused damage for months after the policy expired.

21

Although the Lexington policy bases coverage on physical damage occurring during the term of the policy, CML correctly argues that the Lexington policy also defines "occurrence" as "an accident, incident, or a series of accidents or incidents <u>arising immediately out of a single event or originating cause</u>." (Lexington Policy at LUW0025 (emphasis added).)  This language requires consideration of whether damage events originate from a common cause.  Reading the "occurrence" definition together with the insuring agreement, the court must determine whether physical damage during the policy period was part of a series of events that caused post-April 6, 2012 damages.  In other words, CML must prove that its post-April 6, 2012 damages were in fact caused by pre-April 6, 2012 physical damage.

To make the necessary causal connection, CML relies on the testimony of its expert and lay witnesses.  First, Penn Leavitt explained that the hot testing damage disrupted the intended balance of the plant's operation.  The components of the plant "are designed to work as part of an integrated system." (Leavitt Report at 3.)  During hot testing, damage required multiple emergency shutdowns of the plant, which in turn "caused a cycle of 'out of sync' operation and abnormal cycling . . . that continued after April 6, 2012."  (<u>Id.</u>)  CML's second expert, Dr. Michael Nelson, also confirmed that "[t]he component equipment of a concentrator is like other mechanical and electrical equipment, in that frequent unscheduled or unplanned stops and starts are damaging, and too many such stops and starts can be catastrophic." (Nelson Report at 3, ECF No. 223-6.)  Although this testimony supports the general idea that the plant could suffer damage if not run continuously, it does not prove that, in this case, the starting and stopping of the plant and resulting damage was caused by covered physical damage that began during the policy period.  There are a number of reasons why CML's evidence is insufficient.

22

First, even if abnormal cycling occurred during the policy period and caused damage to the plant, abnormal cycling itself does not qualify as physical damage.  The decision in <u>MRI Healthcare Center of Glendale, Inc. v. State Farm General Insurance Co.</u>, 187 Cal. App. 4th 766 (Cal. App. 2010), is persuasive on this issue.  In <u>MRI Healthcare</u>, spring storms in 2005 led to roof damage to the insured healthcare center.  During repairs, the center's MRI machine had to be demagnetized or "ramped down."  But once ramped down, the machine failed to ramp back up.  The insured claimed that because the storms occurred during the policy period and set into motion the events ending with the machine's failure, it should recover both the amount to repair the MRI machine and the lost income incurred while the machine was inoperable.  The court concluded that "[a]ny damage suffered by the MRI machine in 2006 was not directly attributable to the 2005 storms."  <u>Id.</u> at 780.  Moreover, "the MRI machine was not 'damaged' in the ordinary meaning of the word.  In effect, the machine turned off and could not be turned back on."  <u>Id.</u> Under these circumstances, there was no direct physical damage to the MRI machine that qualified as a covered loss under the policy.

Under <u>MRI Healthcare</u>, shutdowns of the Iron Mountain plant (or abnormal cycling) do not constitute physical damage that would be covered by the policy.  While the cycling may have been caused by events during the policy period and may have caused later damage to plant equipment, the shutdowns alone do not qualify as physical damage.

In response, CML cites cases that hold that, even in the absence of visible damage, direct physical damage can be established by showing that the insured property was rendered unusable or uninhabitable.  <u>See, e.g.</u>, <u>Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.</u>, Civ. No. 2:12-cv-04418 (WHW)(CLW), 2014 WL 6675934 (D.N.J. Nov. 25, 2014); <u>Wakefern Food</u>

Corp. v. Liberty Mut. Fire Ins. Co., 968 A.2d 724 (N.J. 2009); W. Fire Ins. Co. v. First Presbyterian Church, 437 P.2d 52 (Colo. 1968).  But CML has not shown that its plant was rendered unusable.  The evidence in fact confirms that the plant produced iron products—albeit lower quality products than expected—that were sold while the damage to the plant was occurring and being fixed.

Moreover, even if the court were to conclude that abnormal cycling qualifies as physical damage, or to the extent that CML posits that actual physical damage during the policy period caused abnormal cycling, which in turn caused post-policy damage, CML does not have the necessary evidentiary support for this theory.  As discussed above, CML has produced evidence of multiple instances of specific physical damage that occurred during the policy period.  But beyond stating that abnormal cycling could result and cause subsequent physical damage, CML has not presented evidence that any of the covered physical damage caused abnormal cycling or otherwise caused CML's post-April 6, 2012 damages.

Several CML witnesses testified in reports, depositions, or declarations, that all of CML's damages were caused by starts and stops during hot testing, but none of the witnesses provided the underlying support for their statements.  Mr. Leavitt stated that "Hot Testing Damage before April 6, 2012 not only caused the Plant to suffer physical loss and damage to Plant machinery, but it also led to the spiral of Abnormal Cycling after April 6, 2012."  (Leavitt Report at 3.)  Mr. Leavitt does not provide any additional detail, or explain what aspect of damage led to abnormal cycling, or otherwise provide the basis for his statement.  Indeed, Mr. Leavitt testified at his deposition that he did not undertake any failure analysis to determine the potential causes of post-April 6, 2012 damage.  (Leavitt Dep. 244-45, 267-68, ECF No. 238-6.)

24

Dr. Nelson opined that

> as a result of the problems that occurred during startup, the concentrator experienced repeated cycling, on and off, of the entire plant that can only be characterized as abnormal and that the abnormal cycling extended for more than a year. The extended period of abnormal cycling was most certainly damaging to the equipment and components in the plant.

(Nelson Report at 3-4.)  At Mr. Nelson's deposition, however, he acknowledged that he did not evaluate any particular equipment damage or failure at the plant and did not analyze what caused the damage.  (Nelson Dep. 116, 147-49, ECF No. 223-2.)  In addition, he did not offer any opinion about whether any particular instance of damage was the result of abnormal cycling.  (Id. at 130.)  Even though Mr. Leavitt and Dr. Nelson have been designated as experts, it is a "well-settled principle that an expert opinion may not be sufficient to overcome summary judgment if 'it is conclusory and thus fails to raise a genuine issue of material fact.'"  Medina v. Cram, 252 F.3d 1124, 1133 (10th Cir. 2001) (quoting Matthiesen v. Banc One Mortg. Corp., 173 F.3d 1242, 1247 (10th Cir. 1999)).

The testimony from CML's lay witnesses is similarly insufficient.  Although Samuel Paioletti and Dale Gilbert each testified in depositions that hot testing caused abnormal cycling, neither witness identified specific damage that caused abnormal cycling; they merely blamed hot testing generally.  Both men also provided declarations in which they state that instances of physical damage resulted from abnormal cycling.  But neither Mr. Paioletti nor Mr. Gilbert identified any specific physical damage that supported their statements.  Indeed, at Mr. Paioletti's deposition he was asked whether anyone had tied the concept of abnormal cycling to actual equipment failures.  Mr. Paioletti responded, "[N]obody has come up with the true individual reason for a lot of those things.  We still have to just look at it as a whole."  (Paioletti Dep. 35:8-

13, ECF No. 238-7.)  Josh Maida from Samuel Engineering witnessed much of the damage at the plant, but he also could not affirmatively say that any of the damage was caused by starts and stops at the plant. (Maida Dep. 314-15, ECF No. 223-2.)

Finally, CML cites testimony from Mr. Edwards, and from its financial expert, Kent Goates.  These men provide only conclusory statements without any indication of the factual basis for their testimony.  Significantly, even if they had analyzed the breakdowns at the plant, Mr. Edwards and Mr. Goates are accountants; neither is a technical expert with the necessary qualifications to testify about equipment damage.

To support the conclusion that post-policy damages were caused by pre-April 6, 2012 damage, CML must provide more than conclusory statements that general hot testing caused abnormal cycling, which caused all of CML's claimed damages. CML has not done so and therefore cannot survive summary judgment.  See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 674 (10th Cir. 1998) ("Vague, conclusory statements do not suffice to create a genuine issue of material fact."); Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995) (plaintiff could not survive summary judgment where her opposition was based on affidavits that were "merely conclusory and [did] not provide any factual bases for the inference" to support her claim); De Adder v. Intermountain Healthcare, Inc., 2013 UT App 173, ¶ 21, 308 P.3d 543 ("[C]onclusory statement[s], unsupported by facts, cannot create an issue of material fact to survive summary judgment.").  Even if abnormal cycling could have caused specific instances of physical damage during the policy period, CML has not submitted evidence showing that a specific failure or instance of damage resulted in ongoing damage after April 6, 2012.

**B.      Damages Occurring Before But Discovered After April 6, 2012**

As an alternative theory, CML argues that "if physical damage occurred at CML's Plant

prior to April 6, 2012 but was not discovered until after April 6, 2012, the Policy will cover that

harm." (See Mem. in Opp'n to Lexington's Mot. for Summ. J. No. 1 Re CML's Physical

Damage Claims at 7, ECF No. 261.)  The court agrees with the general proposition that a covered

loss can appear after the policy period.

But here, the court has thoroughly reviewed the evidence submitted by the parties and has

not found evidence of latent physical damage that occurred during the policy period but did not

appear until after.  Even if abnormal cycling occurred before and after the policy period, CML

cannot simply point to multiple starts and stops and argue that they should be treated as one

continuous sequence of events.  To support recovery under its theory, CML must prove not only

damage before and after the policy period but a continuous, causal link between the two.

In sum, CML has produced evidence that physical damage occurred in the policy period.

And there is evidence to support the proposition that starts and stops occurred during hot testing

and caused damage at the plant.  The missing piece is evidence that links any physical damage

that occurred before April 6, 2012, to damage occurring after.  Because CML has not offered

such evidence, the court grants Lexington's Motion for Partial Summary Judgment No. 1 Re

CML's Physical-Damage Claims (ECF No. 231) on the issue of post-April 6, 2012 damages.

**III.    Remaining Motions**

Granting summary judgment on CML's  post-April 6, 2012 damages necessarily

determines the court's decisions for the remaining seven motions for partial summary judgment.

Six of the motions involve claims under the policy's Delay in Completion Endorsement.  All of

27

CML's claims under the endorsement involve post-April 6, 2012 economic losses, including lost income, lost gross earnings, and soft costs, which includes the costs to install a water pipeline to the plant.  The endorsement indemnifies CML for delay in completion loss "caused by direct physical loss or direct physical damage to the Insured Property during the Period of Insurance." (Lexington Policy at LUW0007.)  In other words, to recover on its claim, CML has the burden to prove that direct physical damage during the policy period caused the delay losses.

CML's claims under the endorsement suffer from the same problems as its post-policy physical damages claim: there is no evidence to establish the necessary causal link between the delay losses that occurred after April 6, 2012, and a covered instance of physical damage before April 6, 2012.  The court therefore denies CML's motions and grants Lexington's motions that invoke the Delay in Completion Endorsement.

Lexington's final motion seeks dismissal of CML's claims for bad faith and punitive damages.  In response to Lexington's motion, CML agrees that Utah law does not allow for punitive damages in a first-party bad faith action and does not oppose dismissal of the punitive damages demand.  (Mem. in Opp'n to Lexington's Mot. for Summ. J. No. 7 Re: CML Metals Corporation's Bad Faith and Punitive Damages Claims at 15, ECF No. 267.)  In addition, because the court has concluded that Lexington was justified in denying the majority of CML's claim (in particular the amount for post-April 6, 2012 damages), CML's bad faith claim must be dismissed as well.  See S.W. Energy Corp., 1999 UT 23, ¶ 20 ("[G]iven that the insurer's denial of coverage was proper, [plaintiff's] claims for bad faith . . . and punitive damages were appropriately dismissed."). The court therefore grants summary judgment on CML's bad faith and punitive damages claims.

**CONCLUSION**

For the foregoing reasons, the court orders as follows:

1.      CML's Motion for Partial Summary Judgment and Supporting Memorandum Number 1 – Hot Testing Extension (ECF No. 208) is GRANTED.

2.      CML's Motion for Partial Summary Judgment and Supporting Memorandum Number 2 – Commercial Operations (ECF No. 209) is DENIED.

3.      CML's Motion for Partial Summary Judgment and Supporting Memorandum Number 3 – Gross Earnings Calculation (ECF No. 228) is DENIED.

4.      Lexington's Motion for Partial Summary Judgment No. 1 Re CML's Physical-Damage Claims (ECF No. 231) is GRANTED IN PART AND DENIED IN PART.  The court grants the motion to the extent Lexington seeks dismissal of CML's claim for post-April 6, 2012 damages. And because the work done by Tons Per Hour and the related air compressor rentals also occurred after April 6, 2012, these damages are included in the court's grant of summary judgment.  The court denies the motion for damages that occurred before April 6, 2012.

5.      Lexington's Motion for Partial Summary Judgment No. 2 Re CML's Delay in Completion Claim (ECF No. 232) is GRANTED.

6.      Lexington's Motion for Partial Summary Judgment No. 3 Re Causation Under the Delay Endorsement (ECF No. 233) is GRANTED.

7.      Lexington's Motion for Partial Summary Judgment No. 4 Re Application of the Hot Testing Deductible (ECF No. 234) is DENIED.

8.      Lexington's Motion for Partial Summary Judgment No. 5 Re: CML Metals Corporation's Claim for Unscheduled Soft Costs and Legal Fees (ECF No. 235 ) is GRANTED.

9.      Lexington's Motion for Partial Summary Judgment No. 6 Re Water Pipeline and

Transfer of Water Rights (ECF No. 236) is GRANTED.

10.     Lexington's Motion for Partial Summary Judgment No. 7 Re: CML Metals

Corporation's Bad Faith and Punitive Damages Claims (ECF No. 237) is GRANTED.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge